**State of WASHINGTON, Plaintiff,**

**v.**

**Spencer ABRAHAM, Secretary of Energy, et al., Defendants.**

**No. CV–03–5018–AAM.**

United States District Court, E.D. Washington.

Jan. 24, 2005.

Joseph Earl Shorin, III, Kritie Carevich, Attorney General of Washington Department of Ecology, Olympia, WA, for Plaintiff.

William Herbert Beatty, Spokane, WA, Cynthia Huber, U.S. Department of Justice Environment and Natural Resources Div., Washington, DC, for Defendants.

## ORDER GRANTING PLAINTIFF'S MOTION FOR PARTIAL SUMMARY JUDGMENT, *INTER ALIA*

MCDONALD, Senior District Judge.

**BEFORE THE COURT** are plaintiff's Motion For Partial Summary Judgment On HWMA Claim (Ct.Rec.122) and defendants' Cross–Motion For Partial Summary Judgment On Plaintiff's HWMA Claim (Ct. Rec.145).

These motions were heard with oral argument on January 11, 2005. Andrew A. Fitz, Esq., argued for the plaintiff. Michael Zevenbergen, Esq., argued for the defendants.

## I. BACKGROUND

In its original complaint, plaintiff State of Washington sought declaratory and injunctive relief against defendants Spencer Abraham, Secretary of the United States Department of Energy, and the Department of Energy itself (DOE), alleging DOE had decided to ship radioactive and radioactive/hazardous mixed transuranic waste to the Hanford Nuclear Reservation (Hanford) in violation of the National Environmental Policy Act (NEPA) and in violation of Washington's Hazardous Waste Management Act (HWMA). On May 9, 2003, this court entered a preliminary injunction against defendants, enjoining them from making any further shipments of transuranic waste (TRU) to Hanford pending final resolution of this litigation. The preliminary injunction was issued based on the court's finding there were "serious questions" regarding a NEPA violation and the balance of hardships tipped in favor of the State.

The State filed an amended complaint on August 19, 2004 which re-alleges the NEPA and HWMA claims. Both the State and defendants now move for summary judgment with respect to the HWMA claim, set forth as Count 3 in the amended complaint.

## II. DISCUSSION

■ The State of Washington administers a hazardous waste program authorized under the federal Resource and Conservation Recovery Act (RCRA), 42 U.S.C. § 6901 et seq. This program includes the HWMA, RCW 70.105. The State contends TRU mixed with non-radioactive hazardous waste (TRUM) which DOE intends to ship to Hanford from Battelle Columbus Laboratory in Ohio will violate the HWMA and its implementing regulations, Washington Administrative Code (WAC) 173–

303, once it arrives at Hanford.[1] This is so, according to the State, because this additional waste is "land-disposal restricted" (LDR) and will not be stored at Hanford solely for the purpose of accumulating enough hazardous waste as necessary to facilitate proper recovery, treatment or disposal. WAC 173–303–140(2)(a) and 40 C.F.R. § 268.50(a)(2).[2] The State contends Hanford already has more than enough LDR waste which is in violation of the HWMA because it is not being stored solely for the purpose of facilitating proper recovery, treatment or disposal thereof. According to the State, this violation will continue unabated for as long as TRUM is stored at Hanford unless DOE provides for treatment of the waste to LDR standards or is subject to an enforceable compliance schedule that provides for certification dates for the waste to be moved to the Waste Isolation Pilot Plant (WIPP) located in New Mexico, in lieu of such treatment.

A treatment, storage or disposal facility may store LDR wastes for up to one year unless the State can demonstrate such storage is not solely for the purpose of accumulating such quantities of hazardous waste as necessary to facilitate proper recovery, treatment, or disposal. 40 C.F.R. § 268.50(b). If such storage extends beyond one year, the facility has the burden of proving the storage is solely for the purpose of accumulating sufficient quanti-

ties to facilitate proper recovery, treatment or disposal. 40 C.F.R. § 268.50(c). According to the State, DOE does not intend to ship off-site TRUM to Hanford solely to allow for the accumulation of such quantities of hazardous waste as necessary to facilitate proper recovery, treatment or disposal, but rather to shift such waste away from other sites to allow the early closure of those sites; a lack of current characterization capacity at those other sites; and a desire by DOE to eliminate storage currently utilized for TRUM at those other sites.

DOE contends 1996 amendments to the 1992 WIPP Land Withdrawal Act (LWA) [3], Pub.L. 102–579, 106 Stat. 4777 (1992), preclude the State from applying HWMA LDR provisions to TRUM bound for Hanford or already stored there. The amended Act, Section 9(a)(1) [4], provides that:

> With respect to transuranic mixed waste designated by the Secretary for disposal at WIPP, such waste is exempt from treatment standards promulgated pursuant to section 3004(m) of the Solid Waste Disposal Act (42 U.S.C. 6924(m)) and shall not be subject to the land disposal prohibitions in section 3004(d), (e), (f), and (g) of the Solid Waste Disposal Act.[5]

According to DOE, TRUM bound for Hanford or already stored there has been

---

1. TRU not mixed with hazardous substances is not covered by the HWMA.

2. WAC 173–303–140(2)(a) provides that land disposal restrictions for wastes designated in accordance with WAC 173–303–070(3)(a)(I), (ii), and (iii) are the restrictions set forth by the Environmental Protection Agency (EPA) in 40 CFR Part 268. Therefore, the HWMA storage prohibition at WAC 173–303–140(2)(a) incorporates by reference 40 C.F.R. § 268.50. The state and the federal restrictions are the same. As the parties have done in their briefs, the court will, unless otherwise

noted, cite to the applicable federal regulations.

3. Referred to as the WIPP Land Withdrawal Act because certain land in New Mexico was "withdrawn" for use as WIPP. See Section 3 of the amended Act..

4. WIPP Land Withdrawal Amendment Act of 1996, Pub.L. 104–201, § 3188(a)(1) (also referred to as the "WIPP Amendments" or the "amended LWA" or the "amended Act.").

5. The Solid Waste Disposal Act is part of the RCRA.

"designated by the Secretary [of the Department of Energy] for disposal at WIPP" and therefore, is not subject to treatment standards or land disposal prohibitions. DOE asserts that TRUM exempt from the land disposal prohibitions of section 3004(d), (e), (f), and (g) (42 U.S.C. § 6924(d), (e), (f), and (g)) is necessarily exempt from the storage prohibition in section 3004(j) (42 U.S.C. § 6924(j)). § 3004(j) provides:

> In the case of any hazardous waste which is prohibited from one or more methods of **land disposal** under this section [§ 3004] (or under any regulations promulgated by the [EPA] Administrator under any provision of this section) the **storage** of such hazardous waste is prohibited unless such storage is solely for the purpose of the accumulation of such quantities of hazardous waste as are necessary to facilitate proper recovery, treatment or disposal.

(Emphasis added).

DOE acknowledges that while Section 9(a)(1) explicitly precludes application of the LDR provisions of the federal RCRA, it does not explicitly prohibit the application of similar requirements under state law. Nevertheless, DOE asserts those state law requirements are preempted because they would preclude "accomplishment of the full purposes and objectives of" the amended LWA. According to DOE, "it is impossible to imagine how the state LDR provisions could be compatible with the relevant provisions of the WIPP Land Withdrawal Act and its amendments, the purpose of which is to exempt TRUM waste from identical LDR provisions under the RCRA." DOE notes that the feder-

al RCRA LDR provisions are incorporated by reference into the HWMA and its accompanying regulations and furthermore, the HWMA, RCW 70.105.109, acknowledges the State's authority to regulate hazardous waste may be preempted by federal law.

**A. Plain Language/Plain Meaning**

■ DOE contends the plain language of Section 9(a)(1), read in conjunction with 42 U.S.C. § 6924(j), exempts TRUM intended to be shipped to Hanford, or already stored at Hanford, from RCRA and HWMA treatment standards, disposal prohibitions, and, in turn, the storage prohibition of § 6924(j). Therefore, DOE says resort to legislative history is unnecessary.

The State disagrees. It contends the phrase "with respect to transuranic mixed waste designated by the Secretary for disposal at WIPP" is ambiguous in light of the language of Section 9(a)(1) as a whole, and in light of the amended LWA as a whole. Therefore, the State says it is appropriate to resort to legislative history which, according to the State, indicates the exemption from treatment standards, disposal prohibitions and, in turn the storage prohibition, is intended to apply only to TRUM at WIPP itself.[6]

■ "[W]hen the statute's language is plain, the sole function of the courts—at least where the disposition required by the text is not absurd—is to enforce it according to its terms." *Hartford Underwriters Insurance Co. v. Union Planters Bank, N.A.*, 530 U.S. 1, 6, 120 S.Ct. 1942, 147 L.Ed.2d 1 (2000). In *Hartford*, the U.S. Supreme Court reiterated what it had previously said in *Connecticut National Bank*

---

**6.** To whatever extent the State may at one time have contended TRUM at Hanford or intended to be shipped there was exempt from treatment standards and disposal prohibitions by virtue of Section 9(a)(1), but not the storage prohibition at § 6924(j), it is clear the State no longer takes that position. It concedes that if TRUM is exempt from disposal prohibitions, it is exempt from the storage prohibition by virtue of the plain language of § 6924(j). It argues, however, that the exemption pertains only to TRUM at WIPP.

*v. Germain,* 503 U.S. 249, 253–54, 112 S.Ct. 1146, 117 L.Ed.2d 391 (1992):

> [I]n interpreting a statute a court should always turn first to one, cardinal canon before all others. We have stated time and again that courts must presume that a legislature says in a statute what it means and means in a statute what it says there. [Citations omitted]. When the words of a statute are unambiguous, then, this first canon is also the last: "judicial inquiry is complete." [Citation omitted].

Consistent with *Hartford* and *Connecticut National Bank* is another recent pronouncement from the Supreme Court in *Lamie v. United States Trustee,* 540 U.S. 526, 124 S.Ct. 1023, 157 L.Ed.2d 1024 (2004), quoting *United States v. Granderson,* 511 U.S. 39, 68, 114 S.Ct. 1259, 127 L.Ed.2d 611 (1994):

> If Congress enacted into law something different from what it intended, then it should amend the statute to conform it to its intent. "It is beyond our province to rescue Congress from its drafting errors, and to provide for what we might think ... is the preferred result."

■ Based on these decisions, and focusing solely on the specific language in the exemption-"[with] respect to transuranic mixed waste designated by the Secretary for disposal at WIPP"-DOE's contention that the exemption applies to TRUM at DOE sites other than just WIPP would be persuasive. In performing a "plain language/plain meaning" analysis, however, this court is not limited to an examination of the language in the exemption "paragraph." "In ascertaining the plain meaning of [a] statute, the court must look to the particular statutory language at issue, **as well as the language and the design of the statute as a whole.**" *McCarthy v. Bronson,* 500 U.S.

136, 139, 111 S.Ct. 1737, 114 L.Ed.2d 194 (1991). (Emphasis added). Because "[n]o statutory provision is written in a vacuum" and "[c]omplex regulatory statutes, often create a web ... of sections, subsections, definitions, exceptions, defenses, and administrative provisions ... we examine the statute as a whole, including its purposes and various provisions." *Carson Harbor Village, Ltd. v. Unocal Corporation,* 270 F.3d 863, 880 (9th Cir.2001).

DOE cannot deny that the purpose of the WIPP Amendments was to speed up the process of making WIPP operational so that it could begin to receive transuranic waste as soon as possible from other DOE sites around the country. This is so even though DOE may argue that exempting TRUM at those other sites from treatment standards, disposal prohibitions, and the storage prohibition, is not inconsistent with that purpose.

Section 9 of the WIPP Amendments pertains to "Compliance With Environmental Laws And Regulations." The exemption language is part of subsection (a)(1) which addresses the "Applicability" of Section 9. Section 9(a)(1) states that "[b]eginning on the date of the enactment of this Act, the Secretary [of Energy] **shall comply with respect to WIPP**" with certain federal statutes and regulations set forth in subparagraphs (A) through (H). (Emphasis added). The plain meaning of this language is that WIPP must comply with these statutes and regulations. After subparagraph (H), comes the exemption language. The exemption is not labeled as subparagraph (I), nor is it labeled as subsection (a)(2). It is clearly part of subsection (a)(1) and this is confirmed by the "Savings Provisions" in Section 14(a) and (b) which refer to the exemption "from the land disposal restrictions described in **section 9(a)(1).**" (Emphasis added).[7] There-

---

7. Indeed, the court notes that the exemption language follows immediately after the con-

clusion of subparagraph (H) without any in-

fore, it reasonably appears the opening paragraph of Section 9(a)(1) containing the language "with respect to WIPP" pertains to the exemption, as well, limiting application of the exemption to WIPP. The exemption language "[w]ith respect to transuranic mixed waste designated by the Secretary for disposal at WIPP" is, of course, not the same as "with respect to WIPP," but it is impossible to ignore that the exemption is part of Section 9(a)(1) which discusses application thereof "with respect to WIPP." Congress did not separate the exemption from the rest of Section 9(a)(1) in a manner that would clearly indicate application of the exemption was to extend beyond WIPP to other DOE sites.

DOE asserts that if Congress had intended to limit application of the exemption to WIPP, it did not need the language following subparagraph (H), but could have included language in subparagraph (C) that "the Secretary shall comply with respect to WIPP, with... the Solid Waste Disposal Act (42 U.S.C. 6901 et seq.) **except, with respect to transuranic mixed waste, the treatment standards in Section 3004(m), the land disposal prohibitions in Section 3004(d), (e), (f) and (g), and the storage prohibition in Section 3004(j)."** (Additional language in bold). It is just as compelling to this court, however, that had Congress intended the application of the exemption to extend to other DOE sites, in addition to WIPP, Congress would have taken steps to make that clear by, at a minimum, setting the exemption language distinctly apart from the rest of Section 9(a)(1).

Moreover, the "Savings Provisions" in Section 14 of the amended LWA are consistent with reading the exemption as applicable to WIPP only. Section 14 provides:

(a) CAA and SWDA: Except for the exemption from the land disposal restrictions described in section 9(a)(1), no provision of this Act may be construed to supersede or modify the provisions of the Clean Air Act ... or the Solid Waste Disposal Act ....

(b) EXISTING AUTHORITY OF EPA AND STATE: No provision of this Act may be construed to limit, or in any manner affect, the Administrator's or the State's authority to enforce, or the Administrator's obligation to comply with:

(1) the Clean Air Act ...;

(2) the Solid Waste Disposal Act ..., except that the transuranic mixed waste designated by the Secretary for disposal at WIPP is exempt from the land disposal restrictions described in section 9(a)(1); or

(3) any other applicable clean air or hazardous waste law.

Section 14(b) refers to the "Existing Authority Of EPA and State," with "State" in the singular and defined in Section 2(16) of the amended LWA as the State of New Mexico where WIPP is located. There is no reference to other "States." The fact the exemption is also referred to in Section 14(a) without geographic limitation does not impress the court as significant since it is subsection (b) which specifically relates to **"Existing Authority"** (emphasis added), whereas subsection (a) does not and instead pertains in a more general fashion to the impact of the amended LWA on the Clean Air Act and the Solid Waste Disposal Act.

Considering Section 9(a)(1) as a whole, as well as the "Savings Provisions" in Section 14, the plain language thereof indicates the exemption for TRUM was intended to apply only to WIPP, more spe-

dentation to even suggest it might be separate and apart from subsection (a)(1).

cifically to TRUM once it arrives at WIPP. In the alternative, the opening paragraph of Section 9(a)(1)("with respect to WIPP") and the "Savings Provisions" at Section 14(b)(2) create an ambiguity as to what is meant by "with respect to transuranic mixed waste designated by the Secretary for disposal at WIPP." Therefore, it is appropriate to examine the legislative history of the WIPP Amendments of 1996. *U.S. v. Buckland*, 289 F.3d 558, 565 (9th Cir.2002)("Where the language is not dispositive, we look to the congressional intent revealed in the history and purposes of the statutory scheme").

### B. Legislative History

The legislative history of the WIPP Amendments is silent with regard to how those amendments specifically affect application of the storage prohibition to DOE sites other than WIPP, and indeed to WIPP itself. There simply is no mention of the storage prohibition of 42 U.S.C. § 6924(j). This silence, however, is revealing about Congressional intent regarding the application of the exemption in Section 9(a)(1), particularly when what was actually said by members of Congress consistently focuses on WIPP and making it capable of accepting TRUM from other DOE sites. Of course, there are references to other DOE sites because of the TRUM stored at those sites (INEL, Rocky Flats, etc.), but only in the limited context of the need to move that TRUM to WIPP as soon as possible. In sum, while the legislative history may be silent regarding the specific issue of the impact of the WIPP Amendments on the storage prohibition, it clearly indicates WIPP was the focus and that the exemption was to apply only to WIPP.

In September 1995, DOE was actively seeking a "no-migration" determination from EPA for WIPP. Pursuant to 42 U.S.C. § 6924(d)(1)(c), land disposal of hazardous waste that has not been treated to meet LDR treatment standards cannot be determined to be protective of the environment unless it is demonstrated "there will be no migration of hazardous constituents from the disposal unit ... for as long as the wastes remain hazardous." Gaining this determination would have relieved DOE from having to treat TRUM to LDR standards prior to disposal at WIPP. Gaining this determination was an obstacle to the opening of WIPP. The 1996 WIPP Amendments made it unnecessary for WIPP to procure a "no migration" determination from EPA.

It is evident from the legislative history that Congress was aware of the pending "no mitigation" petition at the time it was considering the WIPP Amendments. According to the report from the Committee on Commerce regarding H.R. 1663 [8]:

> Section 9(a)(1) is amended by adding after and below subparagraph (H) the following: "With respect to transuranic mixed waste designated by the Secretary for disposal at WIPP, such waste is exempt from the land disposal restrictions published in part 268 of 40 C.F.R. because compliance with the environmental radiation protection standards published at part 191 of 40 C.F.R. renders compliance with the land disposal restrictions unnecessary to achieve desired environmental protection **and a no migration variance is not required for disposal of transuranic mixed waste at WIPP.**"

H.R. Rep. N. 104–540, pt. 1 (1996) at p. 3, accompanying H.R. 1663. (Emphasis added).[9] The report adds that:

---

**8.** Stand alone bills were introduced in both the House (H.R.1663) and the Senate (S.1402).

**9.** Ex. 11 to Affidavit of Andrew A. Fitz (Ct. Rec.123).

The purpose of H.R. 1663, the Waste Isolation Pilot Plant Land Withdrawal Amendment Act, is to eliminate outdated statutory requirements for, and expedite the commencement of, operations at **the Waste Isolation Pilot Plant (WIPP)**.

*Id.* (Emphasis added).

At page 11, this same report, in a section-by-section analysis of the legislation, states with regard to "Compliance with Environmental Laws and Regulations:"

The applicability of environmental statutes is amended to eliminate Solid Waste Disposal Act "no migration" requirements (40 CFR Part 268). **WIPP remains under the regulatory structure of 40 CFR Parts 191, 194 and 264.** In meetings with DOE and EPA, both principal agencies indicated support for the elimination of the 40 CFR Part 268 restrictions, citing that their application would not be necessary to adequately protect human health and the environment. **Removing this unnecessary and duplicative regulatory burden will have a beneficial effect on opening WIPP and in ensuring a responsible use of taxpayer funding during WIPP's operation.**

(Emphasis added).

Representative Joe Skeen of New Mexico, a co-sponsor of H.R. 1663, testified in support of the bill. One of his comments was:

Finally, Mr. Chairman, I would like to express my strong support for **exempting WIPP** from the no-migration standard in RCRA part 268. Currently,

WIPP is subject to not just double, but triple regulation, and my bill simply deletes part 268 because it imposes unrealistically stringent performance requirements 2,000 feet below the surface.

*Waste Isolation Pilot Plant Land Withdrawal Amendments Act: Hearing Before the Subcommittee on Commerce H.R.*, 104th Cong., 1st Sess. 104–31 (1995), at p. 4. (Emphasis added).[10]

On June 20, 1996, the Senate debated a floor amendment (Amendment No. 4085) to Senate defense authorization bill 1745 (S.1745).[11] Senator Domenici from New Mexico made the following statement:

The law also required **WIPP** to meet two different standards for the disposal of waste at WIPP: radiation release standards **and solid waste standards**. DOE and EPA now agree that demonstrating compliance with both standards is redundant they agree compliance is best proven by meeting the radiation release standards.

Cong. Rec., S 6591–91 (daily ed. June 20, 1996). (Emphasis added).[12]

In the House, the conference report on H.R. 3230, which summarized the WIPP amendments, noted among other things that "[t]he requirement that **WIPP** meet land disposal restrictions of the Solid Waste Disposal Act (42 U.S.C. 6901 et seq.) would be eliminated." H.R. Conf. Rep. No. 104–724, p. 914 (July 30, 1996). (Emphasis added).[13]

Again, as is evident from above, Congress discussed the exemption exclusively in terms of its application to WIPP. In-

---

**10.** Ex. 12 to Affidavit of Andrew A. Fitz (Ct. Rec.123).

**11.** The Senate and House each passed defense authorization bills in 1996, S. 1745 and H.R. 3230, which were resolved in conference to result in the amended LWA Section 9(a)(1) exemption.

**12.** Ex. 13 to Affidavit of Andrew A. Fitz (Ct. Rec.123).

**13.** Ex. 14 to Affidavit of Andrew A. Fitz (Ct. Rec.123).

deed, it appears the only time the exemption was discussed in terms of potential application to other DOE sites, was when New Mexico Assistant Attorney General Lindsay Lovejoy testified on July 21, 1995, before the House Subcommittee On Energy and Power of the Committee on Commerce regarding H.R. 1663. The following colloquy took place between Mr. Lovejoy and Representative Dan Schaefer of Colorado, Chairman of the Subcommittee:

> MR. LOVEJOY: I think, Mr. Chairman, you inquired about the effect of this bill on waste located at other locations. The language of the bill is that with respect to transuranic mixed waste designated by the Secretary for disposal at WIPP, **and that could include waste at Rocky Flats or at INEL,** such waste is exempt from the land disposal restrictions published at Part 268 of 40 C.F.R.. Those restrictions include the prohibition on the storage of waste without compliance with the LDRs. So the waste at other locations would be affected by this bill and the incentive, which was really the origin of the Federal Facility Compliance Act, would be removed.
>
> MR. SCHAEFER: The Chair is very familiar with the Federal Facilities [sic] Compliance Act.
>
> MR. LOVEJOY: I appreciate that. I appreciate the Chair's role in that statute ....

*Waste Isolation Pilot Plant Land Withdrawal Amendments Act: Hearing Before the Subcommittee on Commerce H.R.,* 104th Cong., 1st Sess. 104–31 (1995), at p. 49. (Emphasis added).

Representative Schaefer was very familiar with the Federal Facility Compliance Act (FFCA), Pub. L. No. 102–386, 106 Stat. 1505 (1992) because he was a co-sponsor of that legislation in the House of Representatives. The FFCA was passed in 1992, the same year as the original WIPP Land Withdrawal Act. Among other things, the FFCA clarified that the federal government's waiver of sovereign immunity under the RCRA fully applied to federal facilities. In other words, the FFCA clarified the federal government was making its facilities subject to RCRA's regulation of non-radioactive hazardous waste. This regulation, of course, includes the treatment standards, disposal prohibitions, and the storage prohibition now at issue in this litigation.

On its face, Representative Schaefer's terse response to the concern expressed by Mr. Lovejoy does not reveal much. While it could be argued the inference is that Representative Schaefer was not concerned about the potential application of the exemption to other DOE sites, this court believes the more rational inference is that he simply did not think there was any issue that other DOE sites would continue to be subject to the full slate of RCRA regulations under the FFCA. What makes that the more rational inference is the extreme difficulty this court has in believing that a mere four years after passing the FFCA in 1992, explicitly providing that RCRA applied to **all** federal facilities across the nation, Congress would remove a substantial and significant component of that regulation with respect to TRUM at **all** of those facilities without clearly stating that was its intent. This is particularly so considering that at least one individual (Congressman Schaefer) was involved in the crafting of both the FFCA and the subsequent WIPP Amendments.

DOE contends that if the court considers the "no migration" petition which was pending at the time the WIPP Amendments were passed, that should favor DOE's reading of the Section 9(a)(1) exemption because a successful petition for WIPP under EPA regulations would have exempted TRUM at all DOE sites from treatment standards, disposal prohibitions

and the storage prohibition. ·At the outset, it should be emphasized it is not simply the existence of the "no migration" petition which ,makes the legislative history favor the State's reading of Section 9(a)(1). The court has considered the language of Section 9(a)(1) as a whole, as well as the amended LWA as a whole, in conjunction with comments made by members of Congress and the aforementioned reports from the House of Representatives. This court agrees with DOE that "[t]he fact Congress was aware of EPA's ongoing work, by, itself does not justify the conclusion that the scope of the exemption in the 1996 WIPP Amendments is equivalent to what EPA might have done." The court agrees with DOE that ultimately, "the scope of the exemption is defined by the statutory language, not the scope of any 'no migration' determination that EPA might have made." EPA did not make a "no migration" determination and so no one knows for sure what the scope of such a determination would have been and if it would have been the equivalent of what is found in Section 9(a)(1). While it is possible a "no migration" determination would have been the equivalent of what is found in Section 9(a)(1), it is just as possible that such a determination could have been accompanied by a number of conditions making it more limited in scope than the typical "no migration" determination.

It is, of course, not the province of this court to make policy judgments. That is for Congress. This court believes, however, that limiting application of the Section 9(a)(1) exemption to WIPP is consistent with a rational policy judgment by Congress. DOE does not deny that its read-

ing of Section 9(a)(1), applying the exemption to all DOE sites, .would potentially allow storage of TRUM indefinitely at those sites merely by virtue of DOE having designated it for disposal at WIPP. DOE suggests any concern in this regard should be mitigated by the fact that it is already in the process of sending TRUM to WIPP (at least, contact-handled TRUM)[14], and if, at some point, the process comes to a halt, the State can challenge DOE's "designation" of the TRUM for disposal at WIPP. While it is not wholly implausible that Congress intended such a result, it is less plausible than an intention to limit application to WIPP in light of the fact there is nary a word in the legislative history of the WIPP Amendments that Congress meant to roll back the authority it had given the States under the FFCA just four years earlier. A review of the intense effort required to obtain this waiver of federal supremacy, and its importance to the drafters, would require, at the least, a clear expression of their intent to surrender so soon that which they had accomplished four years earlier.

As the State notes, under the FFCA, DOE has the ability to send **untreated** TRUM from Hanford to WIPP, provided it is done in accordance with a schedule negotiated with the State. Treatment is unnecessary if the TRUM is disposed at WIPP in accord with the schedule. Therefore, a mechanism remains for DOE to avoid incurring the cost of treatment, thus refuting DOE's contention that limiting the exemption to WIPP necessarily forces DOE to treat TRUM bound for WIPP.[15] Only if DOE fails to meet the schedule is it

---

14. DOE indicates it has every reason to believe additional regulatory approval needed to send certain designated PCB–TRUM (polychlorinated biphenyls) can be obtained and that with regard to RH–TRUM (remote-handled), all remaining regulatory approvals will

be obtained so that it can be disposed at WIPP beginning in 2006.

15. DOE asserts it is the avoidance of costly treatment which could have motivated Congress to apply the exemption to all DOE sites, not merely WIPP.

required to treat the TRUM which, as the State acknowledges, would then allow DOE to store the TRUM indefinitely at Hanford or indeed, potentially even dispose of it there.

### C. Preemption

There is no preemption issue because of the court's finding that the exemption in Section 9(a)(1) applies only to WIPP in New Mexico. With regard to TRUM at Hanford, DOE remains subject to both the federal RCRA and the Washington State HWMA regulations governing treatment, disposal and storage. There is no conflict between federal and state law which requires the court to engage in a preemption analysis.[16]

### III. CONCLUSION

The "plain language" of Section 9(a)(1) as a whole, and the amended LWA as a whole, reveals that the TRUM exemption applies only to WIPP. At a minimum, the language "designated by the Secretary for disposal at WIPP" is ambiguous, requiring examination of the legislative history of the 1996 WIPP Amendments. This examination leads the court to conclude the exemption applies only to WIPP, and that federal RCRA and Washington State HWMA regulations pertaining to treatment standards and disposal and storage prohibitions remain in effect at Hanford with respect to TRUM already stored there, or intended to be shipped there.

Plaintiff's Motion For Partial Summary Judgment On HWMA Claim (Ct.Rec.122) is **GRANTED** and defendants' Cross–Motion For Partial Summary Judgment On Plaintiff's HWMA Claim (Ct.Rec.145) is **DENIED**. The plaintiff is awarded judg-

ment on Count 3 of the amended complaint pertaining to its HWMA claim.

**IT IS SO ORDERED.** The District Executive shall forward copies of this order to counsel of record.

---

**16.** Whether New Mexico state law regarding treatment standards and disposal and storage prohibitions continues to apply to WIPP is a question this court need not decide, although Section 14(b) of the "Savings Provisions" of the amended LWA would seem to tilt the preemption analysis in favor of DOE.