**FOR PUBLICATION**

# UNITED STATES COURT OF APPEALS
# FOR THE NINTH CIRCUIT

STATE OF WASHINGTON,
            *Plaintiff-Appellee,*

v.

STEVEN CHU,* Secretary of Energy;
US DEPARTMENT OF ENERGY,
            *Defendants-Appellants,*

and

YES ON I-297: PROTECT
WASHINGTON, Proposed
Intervention as Counterclaim;
GOVERNMENT ACCOUNTABILITY
PROJECT, Proposed Intervention as
Counterclaim; FLUOR HANFORD
INC.,

            *Defendants.*

No. 06-35227

D.C. No.
CV-03-05018-AAM

OPINION

Appeal from the United States District Court
for the Eastern District of Washington
Alan A. McDonald, District Judge, Presiding

Argued and Submitted
October 16, 2007—Seattle, Washington

Filed March 10, 2009

Before: Richard D. Cudahy,** Stephen Reinhardt, and
Richard A. Paez, Circuit Judges.

*Steven Chu is substituted for his predecessor, Samuel W. Bodman, as
Secretary of Energy. Fed. R. App. P. 43(c)(2).

**The Honorable Richard D. Cudahy, Senior United States Circuit
Judge for the Seventh Circuit, sitting by designation.

Opinion by Judge Paez

**COUNSEL**

Michael Zevenbergen, United States Department of Justice, Washington, D.C.; John A. Bryson, Attorney, United States Department of Justice, Washington, D.C., for the defendants-appellants.

Andrew A. Fitz, Assistant Attorney General, State of Washington, Olympia, Washington, for the plaintiff-appellee.

Darrell G. Early, Deputy Attorney General, State of Idaho, Boise, Idaho, for amici curiae the States of Idaho and Tennessee.

**OPINION**

PAEZ, Circuit Judge:

Between 1943 and 1987, the United States produced plutonium for use in nuclear weapons manufacture at the Hanford Nuclear Reservation in southeastern Washington near the confluence of the Columbia, Snake, and Yakima Rivers. Plutonium production and related activities at Hanford created enormous amounts—in the millions of tons—of radioactive, hazardous, and "mixed" radioactive and hazardous wastes, much of it still at Hanford awaiting treatment and/or disposal. The Department of Energy ("DOE") is responsible for the

treatment, storage, and disposal of this vast waste inventory. This suit arises out of a longstanding dispute between the State and DOE concerning DOE's management of Hanford's existing backlog of mixed radioactive and hazardous waste, commonly known as TRUM, and DOE's decision to ship additional "off-site" TRUM to Hanford for storage pending the future disposal of such waste at the Waste Isolation Pilot Plant ("WIPP"), a nuclear waste repository in southeastern New Mexico where the wastes are expected to be placed in a salt bed approximately 2,150 feet below the earth's surface.

The State contends that DOE's management of this TRUM violates provisions of the State's Hazardous Waste Management Act ("HWMA") and its implementing regulations, which act in lieu of the federal provisions of the Resource Conservation and Recovery Act of 1976 ("RCRA"), 42 U.S.C. §§ 6901-6992k. *See* 51 Fed. Reg. 3782 (Jan. 30, 1986) (authorizing the State of Washington to administer its HWMA in lieu of RCRA); Wash. Rev. Code §§ 70.105.020, 70.150.130; Wash. Admin. Code 173-303-140(2)(a).[1] DOE argues that it no longer has an obligation under HWMA to treat TRUM waste or to limit the length of time such waste is stored at Hanford or any other location, because the waste has been "designated" by the Secretary of Energy "for disposal at WIPP," in accordance with the WIPP Land Withdrawal Amendment Act of 1996, Pub. L. 104-201, § 3188(a)(1) (also referred to as the "1996 WIPP Amendments" or the "amended Act.").

---

[1]RCRA allows states to apply for authorization from the Environmental Protection Agency ("EPA") to administer a hazardous waste program. *See* 42 U.S.C. § 6926(b). Washington's HWMA is one such authorized program. *See* Wash. Rev. Code §§ 70.105.020, 70.150.130; Wash. Admin. Code 173-303-140(2)(a). With respect to the land disposal restrictions that are at the heart of this case, Wash. Admin. Code 173-303-140(2)(a) provides that land disposal restrictions for TRUM are the restrictions established by the EPA in 40 C.F.R. § 268. For ease of discussion, we refer throughout to the relevant federal regulations.

After agreeing to dismiss without prejudice Counts 1 and 2 of the State's amended complaint, the parties filed cross-motions for summary judgment on the remaining claim of whether TRUM "designated for WIPP" was exempt from HWMA provisions by virtue of the amended Act. The district court rejected DOE's interpretation of the amended Act and found that neither the plain text nor the legislative history demonstrated that the "designation exemption" reached waste at any location other than WIPP. *See Washington v. Abraham*, 354 F. Supp. 2d 1178, 1187 (E.D. Wash. 2005). Because the district court found that the amended Act applied only to WIPP, it declined to reach the preemption issue and awarded summary judgment for the State. *Id.* We review *de novo*, and affirm.

## I.  Background

Among the wastes generated during plutonium production at Hanford were large quantities of transuranic waste. Transuranic waste—which consists of a variety of materials, including tools, equipment, protective clothing, rags, graphite, glass, and other material contaminated during the production and reprocessing of plutonium—is waste that has been contaminated with radioactive elements and carries a periodic table value greater than uranium. Although it is less radioactive than spent fuel or high-level waste, it is toxic and long-lived. When transuranic waste is mixed with non-radioactive hazardous waste, such as solvents or heavy metals, the resulting waste is known as "mixed" transuranic waste, or TRUM. There are at least 37,000 drums and 1,200 large boxes of suspected TRUM in "retrievable storage" —shallow, unlined soil trenches—at Hanford, all of which has yet to be treated or properly disposed. Because TRUM contains hazardous waste (in addition to being radioactive), its storage, treatment, and disposal is regulated under Subtitle C of RCRA, 42 U.S.C. §§ 6921-6939, which was enacted by Congress in order to subject hazardous waste like TRUM to stringent "cradle-to-

grave" regulation.[2] *United Technologies v. EPA*, 821 F.2d 714, 716 (D.C. Cir. 1987). Because RCRA, and its counterpart the Federal Facilities Compliance Act ("FFCA") are crucial to our inquiry as to the effect of the "designation exemption" in the amended Act, we begin our discussion there.

## A.  RCRA

RCRA subjects TRUM to both "safe storage" requirements[3] and land disposal restrictions.[4] The land disposal restrictions ("LDRs") were added to Subtitle C of RCRA by the Hazardous and Solid Waste Amendments of 1984 ("HSWA"), as part of the Solid Waste Disposal Act ("SWDA"), *see* RCRA § 3004(b)-(m), 42 U.S.C. § 6924(b)-(m). The SWDA amended RCRA to ensure that hazardous waste will only be

---

[2]RCRA does not identify which wastes are hazardous and therefore subject to Subtitle C regulation because it leaves that designation to the EPA, 42 U.S.C. § 6921(a). TRUM, or "mixed waste," however, is defined as waste "that contains both hazardous waste and source, special nuclear, or by-product material subject to the Atomic Energy Act of 1954 [("AEA")]," 42 U.S.C. § 6903(41). Accordingly, TRUM is subject to both RCRA and the AEA. The AEA governs the radioactive component and RCRA (or comparable state legislation such as HWMA) governs the non-radioactive component. *See, e.g.*, State Authorization To Regulate the Hazardous Components of Radioactive Mixed Wastes Under the Resource Conservation and Recovery Act, 51 Fed. Reg. 24,504 (July 3, 1986) (announcing the EPA's determination "that wastes containing both hazardous waste and radioactive waste are subject to the RCRA regulation"); *New Mexico v. Watkins*, 969 F.2d 1122, 1132 (D.C. Cir. 1992) (deferring to the EPA's conclusion that RCRA applies to mixed wastes).

[3]The safe storage requirements call for pre-disposal TRUM to meet container integrity and configuration requirements. *See* 42 U.S.C. §§ 6922, 6924; 40 C.F.R. Parts 262 and 264. There is no dispute in this case that these "safe storage" requirements continue to apply to "designated" waste.

[4]Under RCRA, "land disposal" is defined as including, but not limited to "any placement of such hazardous waste in a landfill, surface impoundment, waste pile, injection well, land treatment facility, salt dome formation, salt bed formation, or underground mine or cave." RCRA § 3004(k), 42 U.S.C. § 6924(k); *see also* 40 C.F.R. § 268.2.

land-disposed if the waste involved as well as the disposal unit meet very stringent requirements. Land disposal of hazardous waste is prohibited unless that waste is "pretreated" in a manner that minimizes "short-term and long-term threats to human health and the environment," RCRA § 3004(m), 42 U.S.C. § 6924(m),[5] or unless the EPA determines, with "a reasonable degree of certainty, that there will be no migration of hazardous constituents from the disposal unit or injection zone for as long as the waste [ ] remain[s] hazardous." RCRA § 3004(d)(1), (e)(1), and (g)(5), 42 U.S.C. § 6924(d)(1), (e)(1), and (g)(5). Further, EPA regulations governing land disposal of hazardous waste requires comprehensive waste analysis and record-keeping to certify that a waste is eligible for land disposal (40 C.F.R. § 268.7), specifies treatment standards for the land disposal of restricted waste (40 C.F.R. §§268.40-49), and specifies procedures for obtaining exemptions (40 C.F.R. § 268.6). With respect to exemptions, the EPA anticipated that there would be "relatively few cases in which [a no-migration] demonstration can be made," 51 Fed. Reg. 40,572, 40,577 (Nov. 7, 1986),[6] and that, if approved, after a formal rulemaking process, the determination would apply only to the land disposal "of the specific restricted waste at the individual disposal unit . . . and would not apply to any other restricted waste at that disposal unit, or to that specific restricted waste at any other disposal unit." 40 C.F.R. § 268.6(i); *see also id.* at § 268.6(a)(1)-(2) (requiring an

---

[5]RCRA requires the EPA to set "levels or methods of treatment, if any, which substantially diminish the toxicity of the waste or substantially reduce the likelihood of migration of hazardous constituents from the waste so that short-term and long-term threats to human health and the environment are minimized." *See* RCRA § 3004(m)(1)).

[6]Indeed, the first no-migration petition to be approved by the EPA was for the test-phase of WIPP. *See* 55 Fed. Reg. 47,700 (Nov. 14, 1990) (allowing DOE to place a limited amount of untreated hazardous waste in WIPP for the purposes of testing and experimentation). This approval was later rendered moot when DOE cancelled the on-site testing because the needed tests could be executed more cheaply above ground. *See* 60 Fed. Reg. 40,379 (Aug. 8, 1995).

"identification of the specific waste" in the petition, including a "waste analysis" of the subject waste).

The LDRs also prohibited end-runs around the prohibitions on land disposal by preventing TRUM from being stockpiled in storage. These "storage prohibitions" restrict storage to that which is "*solely* for the purpose of the accumulation of such quantities of hazardous waste as are necessary to facilitate proper recovery, treatment or disposal." RCRA § 3004(j) (emphasis added), 42 U.S.C. § 6924(j).[7] The amount of time a facility can store waste is limited to one year unless the facility can prove that further storage is required in order to facilitate the proper recovery, treatment or disposal under § 3004(j). *See* 40 C.F.R. § 268.50(b)-(c).[8] Congress enacted this provision because it "believed that permitting storage of large quantities of waste as a means of forestalling required treatment would involve health threats equally serious to those posed by land disposal, and therefore opted in large part for a 'treat as you go' regulatory regime." *Hazardous Waste Treatment Council v. EPA*, 886 F.2d 355, 357 (D.C. Cir. 1989). Under this regime, accumulation of untreated waste for the purpose of reducing or closing other sites is strictly prohibited. *See, e.g.*, *Edison Elec. Inst. v. EPA*, 996 F.2d 326, 335 (D.C. Cir. 1993) (rejecting a reading of § 3004(j) that would

---

[7]Section 3004(j) reads in its entirety as follows:

> In the case of any hazardous waste which is prohibited from one or more methods of land disposal under this section (or under regulations promulgated by the Administrator under any provision of this section) the storage of such hazardous waste is prohibited unless such storage is solely for the purpose of the accumulation of such quantities of hazardous waste as are necessary to facilitate proper recovery, treatment or disposal.

[8]Part (b) of this regulation provides in full, "An owner/operator of a treatment, storage or disposal facility may store such wastes for up to one year unless the Agency can demonstrate that such storage was not solely for the purpose of accumulation of such quantities of hazardous waste as are necessary to facilitate proper recovery, treatment, or disposal." 40 C.F.R. § 268.50(b).

allow the accumulation and storage of wastes until qualified treatment or disposal capacity becomes available).

## B.   FFCA

Congress emphasized its intention to apply this "treat as you go" framework to federal facilities—like Hanford—in the Federal Facility Compliance Act ("FFCA"), *see* Pub. L. No. 102-386, Title I, § 102(a), (b), 106 Stat. 1505, 1506 (1992) (codified in scattered sections throughout 42 U.S.C.). The FFCA was enacted specifically to motivate recalcitrant officials at federal facilities into addressing the continuing backlogs of stored, untreated, mixed waste subject to RCRA's strict storage prohibitions. *See* H.R. Rep. 102-111, at 2 (1992), as reprinted in 1992 U.S.C.C.A.N. 1287, 1288. In particular, the FFCA waived sovereign immunity for the operation of federal facilities and clarified that states could impose civil fines on federal facilities for violations of RCRA. *See* FFCA § 102(a), 42 U.S.C. § 6961. The FFCA also provided that with respect to TRUM at DOE facilities, DOE could avoid the fines and penalties associated with RCRA violations so long as it (1) developed "site treatment plans"—including detailed management schedules regarding the treatment and storage of various wastes—for the waste backlogs; (2) submitted those treatment plans for mixed waste to the states for approval, modification, or disapproval; and (3) maintained compliance with those plans. *See* FFCA § 102(c)(3)(B), 42 U.S.C. § 6939c (codified in RCRA).

At the time FFCA was enacted, DOE and the State of Washington already had a pre-existing plan, the Hanford Federal Facility Agreement and Consent Order ("HFFACO"), which satisfied the requirement of a "site treatment plan" under 42 U.S.C. § 6939c(b)(1)(A)(ii). It is through the development and maintenance of the HFFACO that the State and DOE conferred as to, among other materials, the resolution of Hanford's substantial backlog of TRUM, which was other-

wise being stored—before the additional shipments of "off-site" TRUM—in violation of RCRA § 3004(j).[9]

## C.  1992 WIPP Act

The same year FFCA was enacted to deal with the enormous backlogs of nuclear waste at federal facilities, Congress also proceeded with long-held plans for opening another federal waste repository in southeastern New Mexico known as WIPP. *See*, *e.g.*, Pub. L. 96-164, 93 Stat. 1259 (1979) (authorizing the development of the WIPP site). Due to its unique, geologically-stable salt formations, WIPP promised to be a safe and permanent repository for a substantial fraction of the nation's weapons-related transuranic waste. The WIPP Land Withdrawal Act of 1992 ("1992 WIPP Act"), Pub. L. No. 102-579, 106 Stat. 4777 (1992), withdrew the site from public use, continued the test phase, and established a number of regulatory requirements that DOE was required to meet before WIPP could receive transuranic wastes for permanent disposal. *See* 1992 WIPP Act §§ 3, 8, 9. In particular, the 1992 WIPP Act required that WIPP, like any other facility, comply with a number of existing regulatory frameworks, including the LDRs that had been added to RCRA by the SWDA. *See id.* at § 9(a)(1)(C); *see also* § 14(b)(2) (the statute's savings provision, stating that the 1992 WIPP Act did not "supersede

---

[9]As of 1993, however, DOE and the State had failed to reach an agreement regarding the details of a placeholder milestone for retrievably stored TRUM and other transuranic and low-level wastes. This placeholder has through a settlement related to this litigation been replaced—pending the outcome of this appeal—by the revised M-91 milestone series, which includes detailed time lines for treating TRUM in accord with HWMA, or in the alternative to such treatment, "certifying" untreated TRUM (or TRUM that has been processed to meet WIPP's waste acceptance criteria ("WAC")) for shipment to WIPP. We note that the district court's final judgment provides that the revised M-91 milestones will remain enforceable so long as its judgment remains in effect.

or modify" the land disposal restrictions that were part of the [SWDA]).[10]

Four years later in 1996, in compliance with § 9(a)(1)(C) of the 1992 WIPP Act and in light of WIPP's unique geologically stable salt formations, DOE petitioned the EPA under RCRA § 3004(d)(1)(C) for a "no migration determination" with respect to WIPP. *See* 61 Fed. Reg. 42899 (Aug. 19, 1996).[11] The import of this no-migration determination, like the no-migration determination that had been approved for the test-phase of WIPP, was that, if approved, it would allow WIPP to comply with RCRA's land disposal restrictions by demonstrating that "hazardous constituents will not migrate out of the WIPP disposal unit for as long as the wastes remain hazardous (a regulatory period of up to 10,000 years)." *Id.*

While the "no migration" determination was pending, however, Congress amended the 1992 WIPP Act by passing the WIPP Land Withdrawal Act Amendments ("1996 WIPP Amendments"), Pub. L. No. 104-201, 104th Cong., 2d Sess., §§ 3181-91, 110 Stat. 2422, 2851-54 (1996). The effect of several of those amendments on hazardous waste at Hanford is what is in controversy here.

## II.  Discussion

The 1996 WIPP Amendments accomplished a number of objectives related to the WIPP facility: they eliminated outdated statutory requirements regarding the test-phase of WIPP; continued the EPA's obligation to establish criteria for

---

[10]This prohibition included "all terms and conditions of the No-Migration Determination," which DOE had secured for test-phase waste disposal at WIPP. *See* 55 Fed. Reg. 47,709 (Nov. 14, 1990) (granting a conditional no-migration variance to DOE for purposes of testing and experimentation).

[11]In 1995, DOE filed a "draft" petition with the EPA. *See* 60 Fed. Reg. 40,379 (Aug. 8, 1995).

determining compliance with its disposal regulations; and inserted a number of provisions designed to expedite the commencement of WIPP operations.[12] DOE argues that the 1996 WIPP Amendments also established that TRUM not located at WIPP—including TRUM at Hanford or intended for shipment to Hanford—is exempt from the storage prohibition in § 3004(j). According to DOE, such waste has been "designated by the Secretary [of the Department of Energy] for disposal at WIPP," *see* § 9(a)(1), and therefore, TRUM is no longer "prohibited from one or more methods of land disposal" as required for the storage prohibition in § 3004(j) to take effect.[13] DOE alleges that as long as the waste has been so designated, and virtually all of the TRUM waste at Hanford has been designated,[14] DOE has no obligation under the State's HWMA to treat such waste or to limit the length of time it is stored at Hanford, or any other location, prior to disposal at WIPP.

DOE argues that the plain language of the "designation exemption" in § 9(a)(1) read in conjunction with RCRA § 3004(j) requires that this court adopt its interpretation of § 9, and alternatively, that its interpretation of the designation

---

[12]Stand-alone bills were introduced in the House (H.R. 1663, 104th Cong., 1st Sess. (1995)), and Senate (S. 1402, 104 Cong., 1st Sess. (1995)). Both bills contained the "designation" exemption discussed *infra*, and both became part of the House and Senate versions of what would later be titled the National Defense Authorization Act for Fiscal Year 1997. Differences were resolved in conference and the 1996 WIPP Amendments emerged.

[13]The 1996 WIPP Amendments do not, in enumerating the provisions from which designated waste is exempt, mention the storage prohibition in § 3004(j). However, § 3004(j) states that the storage prohibition is applicable, "[i]n the case of any hazardous waste which is prohibited from one or more methods of land disposal under this section . . . ." It is this language on which DOE relies.

[14]All TRUM, including remote-handled TRUM and TRUM containing PCBs in concentrations at or exceeding 50 ppm, have been designated for disposal at WIPP. *See* 63 Fed. Reg. 3624 (Jan. 23, 1998); 69 Fed. Reg. 39,449 (June 30, 2004); 69 Fed. Reg. 39,456 (June 30, 2004).

exemption is entitled to "substantial deference" under *Chevron U.S.A. Inc. v. Natural Resources Defense Council*, 467 U.S. 837 (1984), *Skidmore v. Swift & Co.*, 323 U.S. 134, 139-40 (1944), or *Auer v. Robbins*, 519 U.S. 452, 462 (1997). Under *Chevron* and its progeny, we first determine whether Congress has "spoken to the precise question at issue." *Chevron*, 467 U.S. at 843. If we, after "employing traditional tools of statutory construction, ascertain[ ] that Congress had an intention on the precise question at issue, that intention is the law and must be given effect." *Id.* at 843 n.9.

> These tools of construction require us first to engage in a textual analysis of the relevant statutory provisions and to read the words of statutes in their context and with a view to their place in the overall statutory scheme. If the proper interpretation is not clear from this textual analysis, the legislative history offers valuable guidance and insight into [c]ongressional intent. However, it is well established that legislative history which does not demonstrate a clear and certain congressional intent cannot form the basis for enjoining regulations.

*Resident Councils of Wash. v. Leavitt*, 500 F.3d 1025, 1031 (9th Cir. 2007) (quoting *Student Loan Fund of Idaho, Inc. v. Dept. of Educ.*, 272 F.3d 1155, 1165 (9th Cir. 2001) (internal citations and quotation marks omitted)). Our analysis of § 9(a)(1) reveals that Congress has clearly required that the designation exemption be applied only to wastes at WIPP.[15]

---

[15]We need not determine what level of deference to accord DOE's interpretation of § 9(a)(1), because we conclude that the section is unambiguous. *See Chevron*, 467 U.S. at 842-43 ("If the intent of Congress is clear, that is the end of the matter; for the court, as well as the agency, must give effect to the unambiguously expressed intent of Congress.") Nonetheless, if we were to conclude otherwise, we believe that DOE's interpretation would be entitled to little, if any, deference. "We give deference to an agency's interpretation of statutes and executive orders it is charged with

## A.   The Text of Section 9(a)(1)

We begin our analysis with the language of § 9(a)(1) and the statutory provisions invoked by that section. DOE argues that the designation exemption plainly applies to wastes not at WIPP. To determine what is "plain," a "court must look to the particular statutory language at issue, as well as the language and the design of the statute was a whole." *McCarthy v. Bronson*, 500 U.S. 136, 139 (1991). Phrases that may seem ambiguous in isolation may be clarified by statutory context. *United Sav. Ass'n v. Timbers of Inwood Forest Assoc.*, 484 U.S. 365, 371 (1988) (Scalia, J., for the majority) ("a provision that may seem ambiguous in isolation is often clarified by the remainder of the statutory scheme . . . because only one of the permissible meanings produces a substantive effect that is compatible with the rest of the law").

Section 9 of the original 1992 WIPP Act is titled "COMPLIANCE WITH ENVIRONMENTAL LAWS AND REGULATIONS," and provides that "[b]eginning on the date of the enactment of this Act, the Secretary [of Energy] shall comply with respect to WIPP" with the federal statutes and regulations listed in subsections (A) through (H). *See* § 9. While there is no question that the 1992 WIPP Act subjected the WIPP facility to a panoply of environmental regulation including the LDRs,[16] the 1996 WIPP Amendments added exemption language to Section 9, on which DOE now relies.

administering. When an agency interprets a statute outside its administration, however, we review that interpretation de novo." *Am. Fed'n of Gov't Employees v. Fed. Labor Relations Auth.*, 204 F.3d 1272, 1274-75 (9th Cir. 2000) (citations and internal quotations marks omitted). Although DOE is "responsible for the management of the [WIPP] Withdrawal," Pub. L. No. 102-579, § 4(a), 106 Stat. 4777, 4780 (1992), the 1992 WIPP Act tasks the EPA and the State of New Mexico with monitoring DOE's compliance with the regulations and statutes outlined in § 9(a)(1), *id.* at § 9(a)(2), (c), (d).

[16]The 1992 WIPP Act also established that WIPP was subject to EPA's Disposal Standards (40 C.F.R. § 191) as the performance requirements for WIPP, *see* 1992 WIPP Act § 8(a), and criteria for determining the facility's compliance with those Disposal Standards (40 C.F.R. § 194). In 1998, the EPA certified that WIPP complied with those standards. *See* 63 Fed. Reg. 27,354 (May 18, 1998).

That language is found in subsection (a)(1), "after and below subparagraph (H)." In its entirety, the amended Section 9(a)(1) provides:

SEC. 9. COMPLIANCE WITH ENVIRONMENTAL LAWS AND REGULATIONS.

(a) In General.—

(1) Applicability.-Beginning on the date of the enactment of this Act, the Secretary shall comply with respect to WIPP, with—

(A) the regulations issued by the Administrator establishing the generally applicable environmental standards for the management and storage of spent nuclear fuel, high-level radioactive waste, and transuranic radioactive waste and contained in subpart A of part 191 of title 40, Code of Federal Regulations;

(B) the Clean Air Act (40 U.S.C. [§] 7401 *et seq.*);

(C) the Solid Waste Disposal Act (42 U.S.C. [§] 6901 *et seq.*);

(D) title XIV of the Public Health Service Act (42 U.S.C. [§] 300f *et seq.*; commonly referred to as the "Safe Drinking Water Act");

(E) the Toxic Substances Control Act (15 U.S.C. [§] 2601 *et seq.*);

(F) the Comprehensive Environmental Response, Compensation, and Liability Act of 1980 (42 U.S.C. [§] 9601 *et seq.*);

(G) all other applicable Federal laws pertaining to public health and safety or the environment; and

(H) all regulations promulgated, and all permit requirements, under the laws described in subparagraphs (B) through (G).

*With respect to transuranic mixed waste designated by the Secretary for disposal at WIPP, such waste is exempt from treatment standards promulgated pursuant to section 3004(m) of the Solid Waste Disposal Act (42 U.S.C. [§] 6924(m)) and shall not be subject to the land disposal prohibitions in section 3004(d), (e), (f), and (g) of the Solid Waste Disposal Act.*

Pub. L. No. 104-201, § 3188 (§ 9(a)(1)) (emphasis to the 1996 amendment added).

DOE argues that this amendment, which exempts designated TRUM waste from the land disposal prohibitions, and by extension the identical HWMA provisions, establishes that DOE no longer has an obligation to treat designated TRUM waste or to limit the length of time such waste is stored at Hanford or any other location prior to disposal at WIPP.

**[1]** DOE first argues that the doctrine of *expressio unius est exclusio alterius* requires us to adopt its interpretation of the designation exemption. This doctrine requires that "where Congress includes particular language in one section of a statute but omits it in *another section* of the same Act, it is generally presumed that Congress acts intentionally and purposely in the disparate inclusion or exclusion." *See Beach v. Fed. Bank*, 523 U.S. 410, 418-19 (1998) (internal citations and quotations omitted) (emphasis added). The cases that DOE

cites in support of its proposition, however, are not on all fours with the present case, because they do not involve differences in language within the same statutory section. *See id.* (explaining that because a statutory right of rescission could cloud a bank's title on foreclosure, that Congress "may well have chosen to circumscribe that risk [in one part of the statute], while permitting recoupment damages regardless of the date a collection action may be brought [in another part of the statute]."); *Or. Natural Res. Council, Inc. v. Kantor*, 99 F.3d 334, 339 (9th Cir. 1996) (finding that because the section discussing the deadline for publishing the final regulation does not mention the filing of the petition, the fact that the filing of the petition is mentioned in another section does not preclude a plain text reading of the publishing deadline).

**[2]** Unlike the cases cited by DOE, the exemption language here falls *within* the 9(a)(1) subsection, as Congress confirmed when, in the savings provision of the 1996 WIPP Amendments, Congress specifically referred to the exemption, "described in section 9(a)(1)." *See* § 14.[17] Further, § 9(a)(1) begins by stating that as of "[the] date of the enactment of this Act, the Secretary [of Energy] shall comply *with respect to WIPP*," with the federal statutes and regulations in the subsequent subparagraphs. The plain and undisputed interpretation of this language is that the WIPP facility must be in compliance with the enumerated environmental regulations. The second phrase ("with respect to [TRUM]") is a *sub-part* of Section 9(a)—"with respect to WIPP." Congress's decision to place the designation exemption at this location indicates

---

[17]Section 14, the "SAVINGS PROVISION," addresses the effect of the statute generally on the Clean Air Act and the Solid Waste Disposal Act. Under the 1996 WIPP Amendments, this provision is unchanged, except for the recognition of the designation exemption "described in section 9(a)(1)." Pub. L. No. 104-201, § 3188(d) (1996). Moreover, DOE has also recognized the designation exemption as being in "Section 9(a)(1)(H)"— a subsection of Section 9(a)(1). *See* 69 Fed. Reg. 39,456 (June 30, 2004) (A DOE record of decision locating the designation exemption at Section 9(a)(1)(H)).

that it meant for the designation exemption to apply only "with respect to WIPP."[18]

DOE also asserts that we must adopt its interpretation of the designation exemption in order to give meaning to the phrase "[w]ith respect to [TRUM] designated by the Secretary for disposal at WIPP" in relation to the introductory phrase of Section 9(a)(1), "with respect to WIPP." " '[S]tatutes must be interpreted, if possible, to give each word some operative effect.' " *Andreiu v. Ashcroft*, 253 F.3d 477, 480 (9th Cir. 2001) (en banc) (quoting *Walters v. Metro. Educ. Enters., Inc.*, 519 U.S. 202, 209 (1997)). DOE argues that in order to give meaning to the word "designate" and the designation process itself, we must assume that Congress included the word "designate" to distinguish the scope of the designation exemption from the scope of the introductory phrase "with respect to WIPP." As a result, we would have to read the designation exemption as applying to wastes not at WIPP, as opposed to only applying the exemption "with respect to WIPP."

Our reading of "the language and the design of the statute as a whole," *McCarthy*, 500 U.S. at 139, however, conflicts with this interpretation and compels the opposite conclusion —that the designation exemption extends only to wastes at WIPP. First, the 1996 WIPP Amendments as a whole are entirely focused on the ongoing establishment of the WIPP site as a depository for transuranic waste. The language and design of the statute as amended pertain solely to WIPP. No section of the statute deals with the conditions, contents, or

---

[18]Further, we have also stated that the doctrine of *expressio unius est exclusio alterius* " 'is a rule of interpretation, not a rule of law,' which we have explained is 'properly applied only when it makes sense as a matter of legislative purpose.' " *United States v. Fuller*, 531 F.3d 1020, 1027 (9th Cir. 2008) (quoting *Longview Fibre Co. v. Rasmussen*, 980 F.2d 1307, 1313 (9th Cir. 1992)). As we discuss below, we do not believe that DOE's interpretation fits with Congress's purpose in enacting the 1996 WIPP Amendments.

schedules for the cleanup of wastes stored elsewhere. All references to the existing regulatory schemes, with the exception of the designated waste in question, emphasize that such regulations, without revision or exception, pertain *to WIPP*.

Further, the treatment standards from which "waste designated . . . for disposal at WIPP" is exempt are critical. Such waste is "exempt from treatment standards promulgated pursuant to section 3004(m) of the Solid Waste Disposal Act . . . and shall not be subject to the land disposal prohibitions in section 3004(d), (e), (f), and (g) . . . ." Because the treatment standards are relevant "for wastes subject to land disposal prohibitions," RCRA § 3004(m), we turn to the land disposal prohibitions to which the exemption refers.

**[3]** All of these prohibitions are plainly location-specific. A waste is not subject to land disposal prohibitions only if there is "a reasonable degree of certainty, that there will be no migration of hazardous constituents *from the disposal unit* or injection zone for as long as the waste [ ] remain[s] hazardous." RCRA § 3004(d)(1), (e)(1), & (g)(5) (emphasis added). The EPA regulations implementing these provisions are just as transparent. The regulations explain that no-migration determinations apply only to the land disposal "of the specific restricted waste at the individual disposal unit . . . and [do] not apply to any other restricted waste at that disposal unit, *or to that specific restricted waste at any other disposal unit*." 40 C.F.R. § 268.6(i) (emphasis added). Accordingly, an exemption from the prohibition from land disposal is contingent both on the identification of a specific restricted waste *and* the identification of a specific disposal unit.

**[4]** The designation exemption does not, itself, specify the disposal unit where the waste will actually be disposed—the exemption provides only that waste be "*designated* for disposal at WIPP"—but we need not look far to determine the unit from which Congress intended to exempt the designated waste. Congress explicitly identified "the individual disposal

unit" when it chose to place the designation exemption within § 9(a)(1)—"with respect to WIPP." DOE's position is not to the contrary. In fact, DOE acknowledges in its opening brief that by amending the 1992 WIPP Act to include the designation exemption, "Congress [ ] in effect granted DOE the no-migration determination that would have been required under RCRA." With this acknowledgement, DOE appears to recognize that Congress did identify a disposal unit, and that designation of waste "for disposal at WIPP" allows DOE to only and ultimately dispose of the waste at WIPP. Throughout this litigation, DOE has never, in fact, argued that the designation exemption allows DOE to land-dispose untreated but designated waste elsewhere on the basis that the *designation itself* establishes that the waste is no longer "land-disposal prohibited."

With respect to the storage prohibition, however, DOE reverses course and argues that the designated waste escapes RCRA's storage prohibition wherever that waste may be located. DOE arrives at this conclusion by reasoning that because the storage prohibition applies only to "hazardous waste which is prohibited from one or more methods of land disposal," *see* RCRA 3004(j), and designated waste is not prohibited from land disposal at WIPP, the waste is in fact no longer "land-disposal prohibited."

This argument is not persuasive. First, by specifically invoking the narrow scope of the land disposal prohibitions at § 3004(d)(1), (e)(1), and (g)(5)—and nowhere mentioning the storage prohibition at § 3004(j)—Congress established that the waste "designated by the Secretary for WIPP" is exempt from the treatment standards and the land disposal prohibitions *with respect to WIPP*. That is precisely what a no-migration determination would have accomplished. Because an exemption for WIPP says nothing about removing the land disposal prohibition from designated wastes at other locations, the logical consequence of Congress's action is that the wastes *not at WIPP* continue to be "prohibited from one or

more methods of land disposal" and that the land disposal restrictions, including the storage prohibition, apply at those locations.

DOE's attempts to rebut this argument by alleging that a successful no-migration determination renders the storage prohibition inapplicable to waste wherever such waste may be stored. This argument is without merit. DOE's citations to the Federal Register and the Code of Federal Regulations, *see* 40 C.F.R. § 268.6, 268.50(d); 54 Fed. Reg. 36,967, 36,968 (September 6, 1989); 51 Fed. Reg. 40,572, 40,579 (Nov. 7, 1986), are inscrutable. They provide no support for the proposition that a no-migration determination for one location has the effect of excluding from the storage prohibition similar waste that is located at other locations. Rather, the sum of these citations merely stands for the principle that if the identified waste is stored at an identified "no migration" location, and a petition for a no-migration determination is successful, that waste can be "stored" at that location without violating RCRA's storage prohibitions, so long as the no-migration determination is valid.

[5] After reading the language of designation exemption in the context of the statute as a whole, we conclude that DOE's interpretation of the designation provision is not compelled by the plain meaning of the statute. The land disposal prohibitions enumerated in the designation exemption simply provide no basis on which to conclude that the specified provisions permit exemptions for itinerant waste or waste wherever such waste may be located. DOE's argument along such lines, which is not a position made explicit in any of DOE's records of decision designating waste for disposal at WIPP, nor supported by any reference to the statute's implementing regulations or to case law, is not compelled by the plain text of § 9 of the 1996 WIPP Amendments and is incompatible with the land disposal prohibitions contained in § 3004(d)(1), (e)(1), and (g)(5). Nonetheless, because our reading of § 9(a)(1) reveals some ambiguity in the text of the statute itself, we turn

to the legislative history of the WIPP Act for further "guidance and insight into Congressional intent." *Resident Councils*, 500 F.3d at 1031.

## B.   Legislative History

[6] After a careful review of the legislative record, we have little difficulty concluding that, in amending § 9(a)(1), Congress intended to remove regulatory obstacles to disposal once the designated waste arrives at WIPP. In particular, there is nothing in the legislative record that demonstrates that Congress contemplated the removal of RCRA's storage prohibition from waste located at facilities other than WIPP.

[7] First, the record is overwhelming that Congress's purpose in enacting the relevant 1996 WIPP Amendments was to speed the opening of the WIPP facility. In particular, Congress and DOE perceived that compliance with numerous environmental regulations had delayed the commencement of waste disposal at WIPP. RCRA's land disposal restrictions, for which DOE's "no migration" determination was pending before the EPA, were specially singled out as duplicative of the regulations that governed the radioactive components of transuranic wastes under the Atomic Energy Act. Further, the EPA had stated in a letter to Senator Larry Craig, who was a key sponsor of the original 1992 WIPP Act, that, in its view, a no-migration determination for WIPP was unnecessary to protect human health and the environment:

> (1) The Agency believes that the human health and environmental hazards presented by the radioactive portion of the waste outweigh the hazards presented by the RCRA hazardous constituents portion of the waste; (2) The Agency also believes that compliance with its comprehensive regulatory scheme under the Atomic Energy Act (40 CFR Part 191), the extensive WIPP Compliance Criteria (40 CFR Part 194), and RCRA permit requirements (40 CFR Part 264) will

adequately protect human health and the environment from releases of RCRA hazardous constituents.

In this light, the Agency, therefore believes that in the narrow context of the WIPP which is subject to comprehensive regulation under the AEA, the [1992 WIPP Act], and RCRA, that a demonstration of no migration of hazardous constituents will not be necessary to adequately protect human health and the environment.

Letter from Mary D. Nichols, Assistant Administrator for Air and Radiation and Elliott P. Laws, Assistant Administrator for Solid Waste and Emergency Response, to Larry E. Craig, United States Senate (Sept. 8, 1995).[19]

   Accordingly, early drafts of the amended Act referred explicitly to the no-migration determination for WIPP. The text of the 1996 Amendments as they emerged from the House's Commerce Committee are illustrative. The relevant draft section stated, again "after and below subparagraph (H)," that

[w]ith respect to transuranic mixed waste designated by the Secretary for disposal at WIPP, such waste is exempt from the land disposal restrictions published at part 268 of 40 C.F.R. because compliance with the environmental radiation protection standards published at part 191 of 40 C.F.R. renders compliance with the land disposal restrictions unnecessary to achieve desired environmental protection and a no migration variance is not required for disposal of transuranic mixed waste at WIPP.

H.R. Rep. No. 104-540, at 19 (1996). What is especially evident from this early draft is not only that the draft language

---

[19]*See* Supplemental Excerpts of Record at 77-80.

tracked the letter that Senator Craig received from the EPA, but also that the phrase, "[w]ith respect to transuranic mixed waste designated by the Secretary for disposal at WIPP," refers only to such waste *at WIPP*. Although this draft language was later both abbreviated and made more specific by enumerating the land disposal restriction provisions, the intention of Congress to remove regulatory burdens with respect to the WIPP facility is overwhelming.

The House Commerce Committee's section-by-section analysis confirms this intent. The report states that the purpose of the relevant amendment is to

> . . . eliminate Solid Waste Disposal Act "no migration" requirements (40 CFR Part 268). WIPP remains under the regulatory structure of 40 CFR Parts 191, 194 and 264. In meetings with DOE and EPA, both principal agencies indicated support for the elimination of the 40 CFR Part 268 restrictions, citing that their application would not be necessary to adequately protect human health and the environment. Removing this unnecessary and duplicative regulatory burden will have a beneficial effect on opening WIPP and in ensuring a responsible use of taxpayer funding during WIPP's operation.

*Id.* at 11. Further, at the only hearing held on the 1996 WIPP Amendments, those who testified repeatedly referred to the fact that the amendment was designed to "exempt[ ] WIPP from the no-migration standard . . . because it imposes unrealistically stringent performance requirements 2,000 feet below the surface." *Waste Isolation Pilot Plant Land Withdrawal Amendments Act: Hearing on H.R. 1663 Before the Subcomm. on Energy and Power of the H. Comm. on Commerce*, 104th Cong. 4 (1995) (statement of Hon. Joe Skeen, Rep. New Mexico); *see also id.* at 1-15.[20]

---

[20]Indeed, we also find telling that following the 1996 WIPP Amendments, the EPA terminated DOE's no-migration petition and cited as the

**[8]** That Congress wanted to avoid duplicative regulatory schemes for depositing TRUM in a geologically unique disposal site is logical and transparent. There is no indication—and DOE points to none—that Congress intended that the designation of waste for disposal at WIPP would affect wastes located at other facilities, or that Congress intended to re-write or re-interpret the meaning or effect of the LDRs. Our review of the legislative history of the 1996 WIPP Amendments demonstrates that Congress intended that the designation exemption apply only to wastes at WIPP; this "intention is the law and must be given effect." *Chevron*, 467 U.S. at 843 n.9.

## III.   Conclusion

**[9]** The designation exemption in the 1996 WIPP Amendments does not exempt designated TRUM wherever it may be located from the land disposal prohibitions or the storage prohibition of the State's HWMA, which acts in lieu of the federal provisions of RCRA. Rather, the amended Act plainly exempts designated waste from the storage and land-disposal prohibitions "with respect to WIPP." On this basis, we affirm the district court's grant of summary judgment to the State of Washington.

**AFFIRMED.**

---

reason that the 1996 WIPP Amendments "*exempted WIPP* from the provisions of the land disposal restrictions." 61 Fed. Reg. 60,704 (Nov. 29, 1996) (terminating review of DOE's no-migration petition, effective Oct. 1, 1996) (emphasis added).